# Supreme Court of Florida

———————

No. SC14-125
———————

**MICHAEL SHANE BARGO, JR.,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[June 29, 2017]

PER CURIAM.

Michael Shane Bargo, Jr., appeals his first-degree murder conviction and sentence of death for the killing of Seath Jackson. We have jurisdiction. See art. V, § 3(b)(1), Fla. Const. For the reasons expressed below, we affirm Bargo's conviction but vacate the death sentence and remand for a new penalty phase based on the United States Supreme Court's opinion in Hurst v. Florida (Hurst v. Florida), 136 S. Ct. 616 (2016), and this Court's opinion on remand in Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied, No. 16-998, 2017 WL 635999 (U.S. May 22, 2017).

# BACKGROUND

The evidence presented at trial established that on the night of April 17, 2011, Bargo and codefendants Amber Wright, Kyle Hooper, Charlie Ely, and Justin Soto murdered the victim.[1]  Bargo planned the murder and directed his codefendants throughout the commission of the murder.  At the time of the crime, Bargo was eighteen years old and the victim was fifteen years old.

Wright and the victim began dating in December 2010, but broke up bitterly in March 2011.  Wright became romantically involved with Bargo around the time of her breakup with the victim.  According to William Samalot, the victim's friend, Bargo wrongly believed that the victim had abused Wright.  Nevertheless, Wright and the victim continued to send text messages to one another after their breakup.

Two or three weeks before the murder, Bargo and the victim threatened one another at Wright's home.  Only one week before the murder, Bargo went to the victim's home and argued with him.  During that argument, the victim's mother heard Bargo tell her son, "I have a bullet with your name on it."

---

1. Wright, Hooper, Ely, and Soto were tried separately from Bargo, and each was convicted of first-degree murder.  Wright v. State, 161 So. 3d 442, 444, 445 n.2 (Fla. 5th DCA 2014).  The Fifth District reversed Wright's first-degree murder conviction and remanded for a new trial, affirmed Hooper's first-degree murder conviction and remanded for resentencing, and affirmed Ely's first-degree murder conviction and life sentence.  Id. at 445, 445 n.2.  Soto did not appeal his first-degree murder conviction.  Id. at 445 n.2.

Hooper, Wright's half-brother, was initially friends with the victim. However, their friendship deteriorated after Wright and the victim broke up. Their friendship further deteriorated when Hooper discovered the victim in bed with a girl in whom Hooper was romantically interested. Hooper admitted that, one week before the murder, he sent a text message to the girl stating that he was going to kill the victim.

In the weeks preceding the murder, Ely allowed some of her friends to move into her two-bedroom home in Summerfield, Florida. Bargo, one such friend, owned and kept a .22 caliber Heritage revolver inside Ely's home. Bargo was known to fire his revolver on Ely's property. Approximately two weeks before the murder, Bargo and Hooper contacted Samalot and the victim to challenge them to a fight at Ely's home. However, when Samalot and the victim approached Ely's home, they heard a gunshot and left the area. Hooper testified that Bargo shot his revolver at Samalot and the victim "to scare them a little bit off." Approximately one week before the murder, two of the home's occupants moved out after Bargo threatened one of them with his revolver during an argument. At the time of the murder, Bargo, Hooper, Soto, and Ely were living at Ely's home, where Wright would sometimes stay overnight.

Hooper testified that on April 17, 2011, the day of the murder, he and Bargo "had a conversation about killing [the victim]." Bargo "wanted to make a plan to

do it," and he went to Hooper "because [Hooper] had issues with [the victim] also." That afternoon, Bargo asked Wright to go get the victim and bring him to Ely's home. She agreed. The plan was that Wright would walk with the victim and lure him to Ely's home. Then Bargo, Hooper, and Soto would attack when the victim came inside Ely's home. First, Soto would hit the victim with a wooden object; next, Bargo and Hooper would jump the victim from behind; and finally, Bargo would shoot the victim.

Later that evening, Samalot and the victim visited some neighborhood friends. Samalot noticed that the victim was exchanging text messages with Wright. In those text messages, Wright implemented Bargo's plan. Wright told the victim she wanted to "work things out" with him, asked him to meet her and Ely, and told him not to tell anyone about their meeting. The victim, apparently suspicious this could be a trap, warned Wright in his reply text: "Amber if you have me jump[ed] I will never give you the time of day so if I g[e]t jump[ed] say good[bye] al[right]." She responded that "I could never do that to y[o]u" and "I just want me and y[o]u back." Later, the victim received a phone call from Wright, and Samalot advised the victim not to talk with her. At approximately 9 p.m., Samalot and the victim left a friend's home. They parted ways at approximately 9:15 p.m. Samalot went home, but the victim walked in the direction of Ely's home.

A short time later, Wright and Ely met the victim and the three walked to Ely's home. After the victim entered the home, he sat down in a chair in the living room. Because Soto did not initiate the attack as planned, Hooper grabbed a wooden object and ran into the living room where he delivered a blow to the victim's head. Meanwhile, Wright and Ely ran into Ely's room. Then Bargo, following close behind Hooper with his revolver in hand, began firing at the victim and shot him. The victim fled towards the kitchen and ran out the front door of the home. Soto followed and tackled the victim in the front yard, where Bargo shot the victim again. Bargo and Soto also beat the victim. At Bargo's direction, Hooper joined them and the three of them carried the victim back into the home and put him in the bathtub.[2]

Bargo's plan was to keep the victim alive after the initial assault so that Bargo could kill him and the victim would know his killer before he died. To that end, Bargo stayed in the bathroom with the victim and hit him, cursed at him, and fired more bullets into him. Bargo ultimately killed the victim by shooting him in the face. Thereafter, Bargo and Soto carried the victim's body in a sleeping bag to

---

2. Steven Montanez, a neighbor that lived two homes down and across the street from Ely's home, saw two or three males chase and beat a kid with their fists in Ely's yard and then carry him inside Ely's home at approximately 9:30 p.m. on the day of the murder. Although Montanez testified that he did not hear a gunshot, he heard "doors and stuff" and someone yell, "Get him."

Ely's fire pit and placed it into a large fire.[3]  Bargo and Wright later went to bed, and Hooper tended the fire until about 2:30 a.m.

On the morning of April 18, 2011, James Havens—Wright's and Hooper's "stepdad"—arrived at Ely's home and helped dispose of the victim's remains.[4] Hooper had previously helped Wright and Ely clean up the blood in the home with bleach.  The remains from the fire pit had been stored in three paint buckets with lids, which Bargo and Soto put in the back of Havens' truck along with cinder blocks and cable.  Havens drove Bargo and Soto—at Bargo's direction—to a remote water-filled rock quarry in Ocala, Florida, where they dumped the cinder block laden buckets.

Later that afternoon, after returning from the quarry, Havens and Bargo drove to pick up Hooper from work.  Along the way, Havens received a phone call from Wright's and Hooper's mother.  She informed him that the police were in the neighborhood investigating the victim's disappearance.  After Havens and Bargo picked up Hooper from work, Bargo informed Hooper about the police

3. The State presented evidence that, hours before the murder occurred, Wright asked Bargo if it was time to start the fire in Ely's fire pit and Bargo responded "no."  The State also presented evidence that the fire was started before the victim actually arrived at Ely's home.

4. Havens was present at Ely's home the previous evening when Bargo and the codefendants discussed killing someone.  Havens purportedly left Ely's home because this made him uncomfortable.  Later that night he received a call from Bargo who said, "The deed is done."

investigation.  Bargo borrowed some money from Hooper so that he could leave town.

That same day, Havens drove Bargo to Ocala so that Bargo could see Kristen Williams, an out-of-town girlfriend.  Bargo told Kristen that he and some friends had been in a fight with a kid, Bargo shot him, and they "t[ook] him apart and burn[ed] him and then took him to the rock quarry" near her home.  Next, Havens drove Bargo to Starke, Florida, where Kristen's father lived.  During his stay at the Williamses, Bargo told James Williams, Jr., Kristen's brother, that he had shot a boy eight times with a .22 caliber pistol and killed him.  Bargo also told him that they busted his kneecaps in the bathtub, placed him in a sleeping bag, burned him, put his remains in paint buckets, and took the paint buckets to a rock quarry.  Bargo told Crystal Anderson, James Williams, Sr.'s girlfriend, that he killed a guy who raped his little sister.  Bargo described beating him, chasing him outside, shooting him outside, placing him in a bathtub, beating him some more, and shooting him twice in the face, which killed him.  Bargo also told her that the body was put in a sleeping bag and then burned.  However, because the body did not burn completely, Bargo used pliers to pull the remaining teeth out of the skull one by one.  Bargo told James Williams, Sr., that he shot and killed someone who raped his sister.  Bargo also told Joshua Padgett, a neighbor of the Williamses, that he shot a guy, dragged him into a home, shot him again, burned him, and carried

him into the woods.  Law enforcement arrived at the Williamses' home on April 19, 2011, and took Bargo into custody.  Before being taken into custody, Bargo destroyed his cell phone.

Shortly after his arrest, while in a holding cell, Bargo told a fellow inmate that he killed a kid who raped his girlfriend.  Bargo described shooting him in a chair, placing him in a bathtub, shooting him in the bathtub when he awoke to make sure he was completely dead, and accidentally burning his own face while trying to burn the body.  In addition, David Smith, a retired corrections officer, overheard Bargo tell another inmate that "[t]here were only two witnesses that saw me shoot him."

During the course of their investigation, law enforcement obtained and executed search warrants for Bargo's room in his grandmother's home, Ely's home, and the Ocala quarry.  In Bargo's room in his grandmother's home, law enforcement found a Heritage gun box and a spent .22 caliber cartridge.  In Ely's home, law enforcement found a loaded .22 caliber Heritage revolver and two boxes of live ammunition hidden inside a floor vent.  Law enforcement found .22 caliber casings and live ammunition in several rooms of the home.  In Ely's yard, law enforcement found dried paint on the ground, a rake with dried paint on the tines, drag marks, a pressure washer, and a fire pit that contained possible human remains.  Finally, in the Ocala quarry, law enforcement found a five-gallon bucket

with a plastic bag floating in the water. A dive team found two more such buckets attached to cinder blocks underwater.

Dr. Robert Beaver, an expert in DNA typing and kinship analysis, testified regarding the analysis of the human remains recovered by law enforcement and found they were 63,000 times more likely to be from a biological child of the victim's parents than a randomly chosen Caucasian individual from the United States population. Dr. Michael Warren, an expert in forensic anthropology and human identification, examined the remains from the fire pit and found human bones from various parts of a body that were most likely from a male aged fourteen to eighteen. Having also examined the remains from the quarry, during which he found a projectile in a "large mass of burned tissue and bone," Dr. Warren concluded that they were from the same individual as the remains found in the fire pit. Ronald Lai, a forensic DNA analyst, compared the partial DNA profile from the liver of the victim to known samples from the victim's parents and opined that "the liver could not be excluded from coming from a child of Sonia Jackson and Scott Jackson." Nicole Lee, a Florida Department of Law Enforcement (FDLE) crime laboratory analyst, also testified that DNA analysis of a mass of burned tissue from the fire pit at Ely's home was consistent with being a biological child of the victim's parents.

Crime scene investigators found blood evidence on the bathroom floor, kitchen floor, living room floor, bathroom wall, and kitchen ceiling of Ely's home. Lee testified that she was unable to obtain any DNA evidence from the blood found on the bathroom floor or the kitchen floor, but found Ely's DNA in a mixture in the blood found on the bathroom wall, Hooper and the victim's DNA in a mixture in the blood found on the living room floor, and Bargo's DNA in the blood found on the kitchen ceiling.

Maria Pagan, an FDLE expert in firearms examination and identification, testified that the projectile found in the human tissue was a .22 caliber bullet. Pagan compared a bullet she fired from Bargo's .22 caliber Heritage revolver with the projectile from the victim's tissue and found that they both had the same class characteristics—six grooves with a right twist and correct dimensions—as Bargo's revolver. Pagan was unable to determine whether the projectile from the victim's tissue was fired from Bargo's revolver due, in part, to the condition of the projectile. Ultimately, Pagan concluded that Bargo's revolver could not be excluded as being the murder weapon.

Dr. Kyle Shaw, the medical examiner, testified that he observed a pattern of bright dots consistent with a projectile or bullet impact in an X-ray of a skull fragment found among the victim's remains. Dr. Shaw found this evidence was in turn consistent with a gunshot wound to the head or face. From the totality of the

evidence examined and information obtained, Dr. Shaw concluded the cause of death "was [a] gunshot wound or wounds and blunt force trauma and . . . the manner of death [was] homicide."

Bargo testified at trial in the form of a narrative. Bargo denied participating in the murder, but he admitted his involvement in disposing of the victim's remains. According to Bargo, he argued with Hooper on the evening of the murder and accused Hooper of stealing his revolver. In the resulting fight against Hooper and Soto, Bargo claimed to be the loser and said they broke his nose, blackened his eyes, and busted his lip. Bargo claimed that he showered, drank some beer, searched for his revolver, and left to visit a girlfriend.

Bargo testified that he began walking to his girlfriend's home about 9 p.m. the night of the murder, moving slowly because of a recent injury to his knee. Bargo stated that after more than two hours of walking, including stopping to roll and smoke two joints and vomit, he gave up reaching his destination. He claimed that he called his father, who purportedly picked him up and took him back to Ely's home. Bargo testified that he found Ely scrubbing the floor with bleach and Wright drinking and crying. Bargo claimed that he went to his room and encountered Soto who said he had Bargo's revolver, but would not return it until Bargo talked to Hooper. Bargo claimed that Hooper told him that he shot and killed the victim with Bargo's .22 caliber revolver. According to Bargo, Hooper

- 11 -

threatened to blame the murder on Bargo when Bargo suggested that they should call the police.

The jury found Bargo guilty of first-degree murder with a firearm. During the penalty phase, neighbors, friends, and family testified in support of Bargo, and three expert witnesses testified regarding Bargo's mental health. The jury recommended that Bargo be sentenced to death by a vote of ten to two.

After the Spencer[5] hearing, the trial court sentenced Bargo to death. In imposing the death sentence, the trial court concluded that the two aggravating factors[6] greatly outweighed the two statutory mitigators and fifty nonstatutory mitigators.[7]

## ANALYSIS

On appeal, Bargo raises seven issues: (1) trial counsel provided ineffective assistance that deprived Bargo of a fair trial; (2) the evidence is not sufficient to

---

5. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

6. The trial court found that the following two aggravating factors were proven beyond a reasonable doubt: (1) the murder was especially heinous, atrocious, or cruel (HAC)—great weight—and (2) the murder was cold, calculated, and premeditated (CCP)—great weight.

7. The trial court found two statutory mitigators: (1) the murder was committed while Bargo was under the influence of an extreme mental or emotional disturbance—slight weight—and (2) Bargo was eighteen at the time of the murder—slight weight. The trial court also found that Bargo established fifty nonstatutory mitigators and accorded each slight, little, or moderate weight.

convict Bargo of first-degree murder; (3) the trial court erred by denying Bargo's motion for the appointment of a crime scene expert; (4) Florida's death penalty statute is unconstitutional under Ring v. Arizona, 536 U.S. 584 (2002); (5) the trial court abused its discretion by excluding evidence of threats made by the victim proffered by Bargo during the penalty phase; (6) Bargo's death sentence is disproportionate; and (7) Florida's death penalty violates the Eighth Amendment's prohibition against cruel and unusual punishment.

## I. Ineffective Assistance of Counsel

In the first issue raised in this appeal, Bargo raises four claims of ineffective assistance of counsel.[8]  We decline to address these claims on direct appeal because ineffective assistance of counsel does not appear on the face of the record. See Gore v. State, 784 So. 2d 418, 437-38 (Fla. 2001) ("A claim of ineffective assistance of counsel may be raised on direct appeal only where the ineffectiveness is apparent on the face of the record.").  Bargo is free to raise them in an appropriate postconviction motion.

---

8. Bargo alleges that trial counsel provided ineffective assistance by: (1) failing to refresh Hooper's recollection and impeach Hooper at the guilt phase with his statement that "[t]he only thing we have left is to blame this all on Mike"; (2) arguing to the guilt phase jury that Bargo was "guilty, guilty as hell" of second-degree murder; (3) urging Bargo during allocution at the Spencer hearing that he should tell the trial court whether he wanted "[r]egular or extra crispy"; and (4) failing to argue at the guilt phase that the projectile found in the victim's remains did not match the bullets recovered from Bargo's revolver.

## II. Sufficiency of the Evidence

Bargo claims that the evidence presented at trial does not support his first-degree murder conviction. "In determining the sufficiency of the evidence, the question is whether, after viewing the evidence in the light most favorable to the State, a rational trier of fact could have found the existence of the elements of the crime beyond a reasonable doubt." Bradley v. State, 787 So. 2d 732, 738 (Fla. 2001).

We find that sufficient evidence exists to support Bargo's first-degree murder conviction. Hooper testified at trial that, on the day of the murder, Bargo spoke with him about murdering the victim and directed Wright to bring the victim to Ely's home. Hooper further testified that he saw Bargo shoot and beat the victim at Ely's home. Havens testified that he overheard Bargo and the codefendants discuss killing someone the evening before the murder. Havens also testified that Bargo called him the night of the murder and said, "The deed is done." On the night of the murder, a neighbor saw two or three males chase and beat a kid with their fists in Ely's yard and then carry him inside Ely's home. The State presented evidence that, hours before the murder occurred, Wright asked Bargo if it was time to start the fire in Ely's fire pit yet and Bargo responded "no." The State also presented evidence that the fire was started before the victim actually arrived at Ely's home and that the victim's remains were burned in the

fire. Bargo confessed the murder to an out-of-town girlfriend, her brother, her father, her father's girlfriend, and her father's neighbor. Bargo also confessed the murder to two inmates, and one of those confessions was overheard by a retired corrections officer. Accordingly, competent, substantial evidence exists to support the murder conviction in this case.

### III. Crime Scene Expert

Bargo claims that the trial court erred by denying Bargo's motion for the appointment of a crime scene expert. "This Court reviews the denial of a motion for appointment of experts for an abuse of discretion." Howell v. State, 109 So. 3d 763, 776 (Fla. 2013). "In evaluating whether there was an abuse of discretion, courts have applied a two-part test: (1) whether the defendant made a particularized showing of need; and (2) whether the defendant was prejudiced by the court's denial of the motion requesting the expert assistance." Marshall v. Crosby, 911 So. 2d 1129, 1133 (Fla. 2005) (quoting San Martin v. State, 705 So. 2d 1337, 1347 (Fla. 1997)).

We conclude that the trial court did not abuse its discretion in denying Bargo's motion for the appointment of a crime scene expert. The record indicates that Bargo's trial counsel argued at a pretrial hearing that a crime scene expert was needed to answer unspecified anthropological questions, generally assist in preparing a defense, and possibly assist the jury in understanding the complexity of

the crime scene and any exculpatory evidence in existence at or around the crime scene. However, Bargo's unelaborated and speculative argument made no particularized showing of need.

Regardless, even if we were to assume that defense counsel established a particularized need for a crime scene expert, Bargo could not demonstrate prejudice. Bargo argues that a crime scene expert would have assisted the defense in locating and testing a .22 caliber rifle depicted in crime scene photographs of Ely's home to: (1) determine if the .22 caliber bullet found in the victim's remains could have been fired from the rifle and (2) have the rifle examined for fingerprints. However, even if the bullet found in the victim's remains could have been fired from the .22 caliber rifle, prejudice could not be demonstrated. Bargo confessed to shooting and killing the victim on numerous occasions. On at least one such occasion, Bargo confessed that he shot and killed a boy with a .22 caliber pistol. Hooper testified at trial that Bargo shot the victim with his .22 caliber revolver, and the State presented expert testimony at trial that Bargo's revolver could not be excluded as being the murder weapon. Accordingly, the evidence precludes any showing of prejudice by Bargo.

## IV. **Ring** and **Hurst**

While Bargo's appeal was pending before this Court, the United States Supreme Court issued its decision in <u>Hurst v. Florida</u> in which it held that Florida's

former capital sentencing scheme violated the Sixth Amendment because it "required the judge to hold a separate hearing and determine whether sufficient aggravating circumstances existed to justify imposing the death penalty" even though "[t]he Sixth Amendment requires a jury, not a judge, to find each fact necessary to impose a sentence of death." Hurst v. Florida, 136 S. Ct. at 619. On remand in Hurst we held that

> before the trial judge may consider imposing a sentence of death, the jury in a capital case must unanimously and expressly find all the aggravating factors that were proven beyond a reasonable doubt, unanimously find that the aggravating factors are sufficient to impose death, unanimously find that the aggravating factors outweigh the mitigating circumstances, and unanimously recommend a sentence of death.

Hurst, 202 So. 3d at 57.

In light of the nonunanimous jury recommendation to impose the death sentence, it cannot be said that the failure of the jury to make the required determination was harmless. See Franklin v. State, 209 So. 3d 1241, 1248 (Fla. 2016) ("In light of the non-unanimous jury recommendation to impose a death sentence, we reject the State's contention that any Ring- or Hurst v. Florida-related error is harmless."), petition for cert. filed, No. 16-1170 (U.S. March 23, 2017). We therefore reverse Bargo's death sentence and remand for a new penalty phase. Because we remand for a new penalty phase under Hurst, we decline to address

- 17 -

Bargo's other penalty phase claims and need not address the proportionality of his death sentence.

## CONCLUSION

For the reasons stated above, we affirm Bargo's conviction, vacate his sentence of death, and remand for a new penalty phase.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, and QUINCE, JJ., concur.
PARIENTE, J., concurs with an opinion.
LAWSON, J., concurs specially with an opinion.
CANADY and POLSTON, JJ., concur as to the conviction but dissent as to the sentence.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

PARIENTE, J., concurring.

I concur in the reversal for a new penalty phase in light of Hurst v. State (Hurst), 202 So. 3d 40 (Fla. 2016), cert. denied No. 16-998, 2017 WL 635999 (U.S. May 22, 2017), based on the lack of a jury's unanimous recommendation for death. Although the per curiam opinion does not address proportionality because we are reversing for a new penalty phase, I have serious concerns in this case about whether the death sentence is proportionate for this eighteen-year-old with significant mental health mitigation.[9]

--------

9. If the Court were to conclude that the death sentence was disproportionate based on the record, as we did in Wood v. State, 209 So. 3d 1217

- 18 -

The defendant was eighteen years old at the time of the crime, and the trial court found two statutory mitigators (age and under the influence of extreme emotional distress) and numerous nonstatutory mitigators—including that defendant suffers from frontal lobe brain damage, bipolar disorder, schizoaffective disorder, complex partial seizure disorder, hallucinations, and diminished control over inhibitions, was abandoned by his father, grew up in a disadvantaged and abusive home, has a severe substance abuse problem which aggravated a neurological disorder, along with the possibility that the defendant was misdiagnosed and treated for ADHD. The trial court did not ascribe great weight to any of this mitigation. However, a review of the record indicates that Bargo's mental health mitigation reaches far back into his childhood, rather than emanating from evaluations occurring after the murder occurred.

By the age of fourteen or fifteen, Bargo was self-harming. Dr. Berland testified that records "indicated . . . a couple times where [the defendant] had suicidal ideation, which is typical of someone who has a partial complex seizure disorder." Further, when the defendant was in ninth grade and a subject of the Michigan Juvenile Justice System, a psychologist suggested that the defendant be

---

(Fla. 2017), it would then be our obligation to reduce the death sentence to life rather than remand for a new penalty phase.

sent to a mental institution. Rather than being institutionalized, Bargo was sent to boot camp for six months, during which he also attended counseling.

In March 2009, approximately two years before the crime in this case, Bargo was diagnosed with bipolar disorder diagnosis rapid cycling. Although not taking medication at the time of the crime, Bargo had been prescribed several strong medications in the past.

On this record, I am unable to conclude that the sentence should be reduced to life based on proportionality. However, our case law indicates that reliable, uncontroverted evidence of mental health mitigation coupled with age indicates that a sentence of death may be disproportionate, even in light of substantial aggravation. See, e.g., Crook v. State, 908 So. 2d 350, 352, 358 (Fla. 2005). Likewise, upon retrial, depending on the jury findings and verdict, the facts of this case may compel the conclusion that a sentence of death for this eighteen-year-old defendant with substantial mitigation is disproportionate.

LAWSON, J., concurring specially.

See Okafor v. State, 42 Fla. L. Weekly S639, S641, 2017 WL 2481266, at *6 (Fla. June 8, 2017) (Lawson, J., concurring specially).

An Appeal from the Circuit Court in and for Marion County,
    David Brent Eddy, Judge - Case No. 422011CF001491AXXXXX

Valarie Linnen, Atlantic Beach, Florida,

    for Appellant

- 20 -

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; and Vivian Singleton, Assistant Attorney General, Daytona Beach, Florida,

for Appellee