# Supreme Court of Florida

---

No. SC19-1744

---

**MICHAEL SHANE BARGO,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

June 24, 2021

PER CURIAM.

This case is before the Court on appeal from a sentence of death. Michael Shane Bargo appeals the sentence of death that was imposed at his resentencing for the 2011 first-degree murder of Seath Jackson. We have jurisdiction. *See* art. V, § 3(b)(1), Fla. Const.

We previously affirmed Bargo's conviction for first-degree murder with a firearm but vacated his sentence of death and remanded for a new penalty phase based on *Hurst v. State*, 202 So. 3d 40 (Fla. 2016), *receded from in part by State v. Poole*, 297 So. 3d

487 (Fla. 2020), *cert. denied*, 141 S. Ct. 1051 (2021). *Bargo v. State*, 221 So. 3d 562, 570 (Fla. 2017) (*Bargo I*). At the new penalty phase, the judge, following the jury's unanimous recommendation, imposed a sentence of death. We affirm.

## BACKGROUND

The facts relating to the crime and investigation are detailed in *Bargo I*. 221 So. 3d at 563-67. In short, the evidence established that on the night of April 17, 2011, at then-eighteen-year-old Bargo's request, codefendant Amber Wright lured fifteen-year-old Seath Jackson to codefendant Charlie Ely's home, so that Bargo, codefendant Kyle Hooper, and codefendant Justin Soto could ambush and kill Jackson. After Jackson was struck in the head by Hooper and shot by Bargo, Jackson unsuccessfully attempted to flee. *Id.* at 565. Jackson was tackled by Soto, shot again by Bargo, beaten, and then put into a bathtub. *Id.*

> Bargo's plan was to keep the victim alive after the initial assault so that Bargo could kill him and the victim would know his killer before he died. To that end, Bargo stayed in the bathroom with the victim and hit him, cursed at him, and fired more bullets into him. Bargo ultimately killed the victim by shooting him in the face. Thereafter, Bargo and Soto carried the victim's body in a sleeping bag to Ely's fire pit and placed it into a large fire.

- 2 -

Bargo and Wright later went to bed, and Hooper tended the fire until about 2:30 a.m.

On the morning of April 18, 2011, James Havens—Wright's and Hooper's "stepdad"—arrived at Ely's home and helped dispose of the victim's remains. Hooper had previously helped Wright and Ely clean up the blood in the home with bleach. The remains from the fire pit had been stored in three paint buckets with lids, which Bargo and Soto put in the back of Havens' truck along with cinder blocks and cable. Havens drove Bargo and Soto—at Bargo's direction—to a remote water-filled rock quarry in Ocala, Florida, where they dumped the cinder block laden buckets.

*Id.* (footnotes omitted). Bargo was later arrested, tried, and "found . . . guilty of first-degree murder with a firearm." *Id.* at 567.

During the initial penalty phase, the jury recommended death by a vote of ten to two. *Id.* at 568. The trial court found two aggravators were proven beyond a reasonable doubt—i.e., that the murder was especially heinous, atrocious, or cruel (HAC), and that the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP)—and assigned both great weight. *Id.* at 568 n.6. The trial court concluded that the two aggravators "greatly outweighed . . . two statutory mitigators and fifty nonstatutory mitigators." *Id.* at 568. And the trial court sentenced Bargo to death. *Id.*

- 3 -

On direct appeal, this Court affirmed Bargo's conviction but vacated his sentence of death and remanded for a new penalty phase based on *Hurst v. State*, while "declin[ing] to address Bargo's other penalty phase claims" or "the proportionality of his death sentence." *Id.* at 570.

At the new penalty phase, the jury unanimously found that the State established the existence of both proposed aggravators (HAC and CCP) beyond a reasonable doubt; that the aggravating circumstances were sufficient to warrant a possible death sentence; that one or more mitigating circumstances was established by the greater weight of the evidence; and that the aggravators outweighed the mitigating circumstances. And the jury unanimously recommended that Bargo be sentenced to death.

After the *Spencer*[1] hearing, the circuit court found that the two statutory aggravators (HAC and CCP) were proven beyond a reasonable doubt, accorded each great weight, and concluded that each "alone would justify the imposition of a death sentence." As to mitigation, the circuit court was "reasonably convinced of the

---

1. *Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

- 4 -

existence of twenty-one (21) mitigating circumstances," assigning them weight as follows: "one (1) was assigned very little weight, ten (10) were assigned little weight, eight (8) were assigned slight weight; and two (2) were assigned moderate weight." The court further found that four proposed mitigators were not "reasonably established" and that three others were not mitigating.[2] Following the jury's recommendation, the court sentenced Bargo to death.

---

2. Specifically, the circuit court found as follows regarding mitigation: (1) Bargo's age at the time of the crime (slight weight); (2) he was under the influence of a mental or emotional disturbance (slight weight); (3) his capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was impaired (not proven); (4) he has a hostile relationship with his mother (little weight); (5) he was diagnosed with ADHD at age 7, and was prescribed Ritalin, Concerta, Focolin and Adderall (little weight); (6) he was found to be a danger to himself or others because of his growing anger through his parents' divorce and was referred to inpatient treatment (little weight); (7) the hostility between his mother and father impacted his development in a negative way (slight weight); (8) he was subject to harassment and teasing during his adolescence because he was smaller than other children in his age group (little weight); (9) Soto and Ely participated in the killing and were sentenced to life in prison (moderate weight); (10) Hooper and Wright participated in the killing (moderate weight); (11) Bargo was diagnosed with an abnormal brain scan, bipolar disorder, schizoaffective disorder and a complex partial seizure disorder (not mitigating "as it was not established . . . that the Defendant actually suffers from the listed medical or mental health conditions"); (12) he is a loving brother who has a close relationship with his sister, Lauren (little weight); (13) he has a severe drug addiction for which he received treatment (little weight); (14) he

- 5 -

**ANALYSIS**

In this direct appeal of his sentence of death, Bargo raises five issues: (1) the 2016 amendment to section 782.04(1)(b), Florida Statutes, retroactively precluded the State from seeking the death penalty at resentencing; (2) the circuit court erred in the application of the HAC aggravator; (3) the circuit court abused its discretion in giving "little or no weight" to the mental mitigation presented by Bargo; (4) the circuit court abused its discretion by failing to

completed his high school education when he obtained a GED (slight weight); (15) he had a loving relationship with his paternal grandmother, Vergie Waller, and his father (little weight); (16) he is a follower and not a leader (not reasonably established); (17) he is artistic like his mother, who is a graphic designer (little weight); (18) he has maintained his behavior during the trial (very little weight); (19) he completed probation in Michigan (little weight); (20) he loved and cared for his dog, Lady, and brought her with him when he moved to Michigan (little weight); (21) he came from a dysfunctional family (slight weight); (22) he was not taking his medications at the time of the killing (no evidence presented that Bargo was prescribed medications that he was not taking at the time of the offense); (23) he sought employment to make money to be self-sufficient (not proven); (24) his paternal grandfather had been committed to a mental health facility and later committed suicide (slight weight); (25) he was prescribed Seroquel for hallucinations and Risperdal for anxiety (little weight); (26) he will have mental health treatment if he is sentenced to life in prison without parole (not mitigating); (27) Hooper developed a plan to blame everything on Bargo (rejected as impermissible attempt to relitigate guilt); and (28) Bargo had an Emotional Quotient (EQ) of a 15-year-old (slight weight).

adequately consider Bargo's age and ten other mitigating circumstances; and (5) Bargo's death sentence is disproportionate. We address each issue in turn.

**I. Section 782.04(1)(b)**

In his first issue, Bargo argues that the State was foreclosed from seeking the death penalty. He asserts that the Notice of Intent to Seek the Death Penalty (the Notice) filed by the State in 2011 was neither "timely filed" nor later "properly amended" to list the proposed aggravators for the new penalty phase. He relies on the purported retroactivity of section 782.04(1)(b), which was amended in 2016 to add certain notice requirements the State must follow when seeking the death penalty. *See* ch. 2016-13, § 2, Laws of Fla.

As amended in 2016, section 782.04(1)(b) provides in part that "[i]f the prosecutor intends to seek the death penalty, the prosecutor must give notice to the defendant and file the notice with the court within 45 days after arraignment," and that "[t]he notice must contain a list of the aggravating factors the state intends to prove." § 782.04(1)(b), Fla. Stat. (2016). The amendment took effect on March 7, 2016. *See* ch. 2016-13, § 7, Laws of Fla. Later in 2016, this Court adopted "new rule 3.181 (Notice to Seek Death

- 7 -

Penalty)" to implement the statutory amendment. *In re*

*Amendments to Fla. Rules of Crim. Proc.*, 200 So. 3d 758, 758 (Fla.

2016). Prior to the statutory amendment and rule adoption, no

statute or rule required the State either to file a notice within 45

days of arraignment to be able to seek the death penalty, or to file a

notice listing the proposed aggravators.[3]

Bargo asserts that the 2011 Notice should be "quashed"

because it was purportedly not filed within 45 days of his waiver of

arraignment, and because it never included a list of aggravators

and was never amended to place him on notice "of the aggravators

for the second penalty phase." He concedes that the State gave him

---

3. Florida Rule of Criminal Procedure 3.202(a) (Notice of Intent to Seek Death Penalty), which was amended in the same 2016 rule-amendments case in which this Court adopted new rule 3.181, did from its adoption in 1995 until its amendment in 2016 contain a requirement that the State "give[] written notice of its intent to seek the death penalty within 45 days from the date of arraignment." *See Amendments to Fla. Rule of Crim. Proc. 3.220 Discovery (3.202 Expert Testimony of Mental Mitigation During Penalty Phase of Cap. Trial)*, 674 So. 2d 83, 85 (Fla. 1995). But rule 3.202 addresses expert testimony of mental health professionals and examinations of defendants by state experts. And, in any event, rule 3.202(a) expressly provided at the time that "[f]ailure to give timely written notice" under that rule did "*not* preclude the state from seeking the death penalty." *Id.* (emphasis added).

notice of the proposed aggravators prior to the initial penalty phase, in which the State pursued the same two aggravators (HAC and CCP) later pursued at the new penalty phase.

In concluding that the State was not precluded from seeking the death penalty, the circuit court here explained that the "new statute and the rule," which "did not exist in 2011 or [2013]," were both "keyed by an arraignment" and that "nobody gets re-arraigned when their case is sent back for a new resentencing." Nevertheless, the court ruled that the State would be limited to the same two aggravators sought at the initial penalty phase, given that Bargo had long been on notice of those two aggravators.

We agree with the circuit court that the State was not precluded from seeking the death penalty.[4] At bottom, nothing in the 2016 legislation evinces any intent to apply to cases in which a defendant was arraigned—or waived arraignment—years before the amendment took effect. *See Jackson v. State,* 256 So. 3d 975, 976 (Fla. 1st DCA 2018) (concluding that the 2016 amendment to

---

4. The circuit court's decision to limit the State to the same two aggravators sought in the initial penalty phase is not before us.

- 9 -

section 782.04(1) did "not apply retroactively to an arraignment that occurred in 2007").

Bargo claims that the 2016 amendment, enacted in the wake of the Supreme Court's decision in *Hurst v. Florida*, 577 U.S. 92 (2016), "establishe[d] a Sixth Amendment right . . . and as such applies retroactively." We disagree. Nothing in *Hurst v. Florida* mentions any right to receive written notice of proposed aggravators, let alone within 45 days of arraignment. Indeed, this Court later in 2016 recognized as much. *See Perry v. State*, 210 So. 3d 630, 636 (Fla. 2016) (concluding that the 2016 amendment to section 782.04(1) was "not required by . . . *Hurst v. Florida*"), *receded from on other grounds by Rogers v. State*, 285 So. 3d 872 (Fla. 2019). We reject Bargo's claim.

## II. HAC – Evidence of Post-death Acts

Bargo next argues that the circuit court improperly "allow[ed] testimony and evidence to the facts of what happened to the victim's body after the murder," and that this evidence "confused the jury as to the proper application of the [HAC aggravator]."[5] He

_____

5. The post-death evidence here included that the victim's body was burned in the firepit; Bargo later pulled out the victim's

- 10 -

relies on *Jones v. State*, 569 So. 2d 1234 (Fla. 1990), in which evidence of post-death acts was presented and in which this Court concluded that the trial court erred in giving the HAC instruction. But based on our review of the record, we conclude that Bargo did not properly preserve the argument he now presents.

Bargo filed a motion in limine seeking to exclude "evidence regarding the disposal of [the victim's] body" as irrelevant to the proof of HAC *and* CCP. In arguing the motion, defense counsel conceded to "not hav[ing] a case on point" but asserted that, once the victim was deceased, that "would complete the two aggravators." The State countered by arguing *only* that the evidence was relevant to CCP because the post-death acts were part of a prearranged plan. Defense counsel ultimately requested, in the event the evidence was presented, that the court give "a special instruction" to advise the jury that the evidence was only relevant to CCP. The court agreed with the State that the evidence was relevant to CCP. And the court agreed with defense counsel that a jury instruction

---

teeth; the victim's remains were placed in paint buckets; and Bargo dumped the buckets down a limerock pit.

would be "the more appropriate way to deal with the evidence." The court concluded that, assuming the State could tie the evidence to CCP, the jury should be instructed "that the evidence is relevant to [CCP] and . . . not relevant to [HAC]." And the court invited defense counsel to submit a proposed instruction.

It does not appear that defense counsel submitted a proposed instruction or that the jury was given a special instruction. As to the HAC and CCP instructions that *were* given, defense counsel offered no objection. And a review of the State's closing argument reveals that, other than one unobjected-to reference to "they burned him" made in the context of arguing for the HAC aggravator, the State discussed the post-death acts solely in the context of arguing for the CCP aggravator, also without objection.

Bargo's argument to this Court is that the evidence of post-death acts was prejudicial *only* regarding HAC. Given the record we just outlined, coupled with what is effectively Bargo's concession that the evidence was otherwise relevant to CCP, Bargo's argument was not adequately preserved for our review. And Bargo nowhere asserts that fundamental error occurred.

## III. Mental Mitigation

Bargo claims that the circuit court abused its discretion in assigning little or no weight to the mental mitigation he presented. "In Florida, the finding of a trial court with regard to mitigation will be upheld if there is competent, substantial evidence for such a finding in the record. . . . Additionally, the weight assigned to a mitigating factor is reviewed under an abuse of discretion standard." *Lebron v. State*, 982 So. 2d 649, 660 (Fla. 2008). We find no abuse of discretion. The circuit court's conclusions here are reasonable and supported by the record. *See Calloway v. State*, 210 So. 3d 1160, 1178 (Fla. 2017) ("This standard [of an abuse of discretion] is only met if no reasonable person would arrive at the same conclusion as that of the trial court.").

A. <u>The first-degree murder was committed while Bargo was under the influence of a mental or emotional disturbance.</u>

The circuit court concluded that this proposed mitigating circumstance was established but assigned it slight weight. The gist of Bargo's argument is that the circuit court "arbitrarily" chose the opinion of the State's experts over those of his experts "without giving clear, objective, and demonstrable reasons as [to] the weight

- 13 -

assigned this mitigating circumstance." But a circuit court is not obligated to provide "demonstrable reasons" for the weight assigned to a mitigating circumstance. *See Rogers v. State*, 285 So. 3d 872, 890 (Fla. 2019) (receding from *Oyola v. State*, 99 So. 3d 431 (Fla. 2012), "to the extent that it employed a requirement that a trial court expressly articulate why the evidence presented warranted the allocation of a certain weight to a mitigating circumstance"). And the record here supports the circuit court's decision to find the State's expert, Dr. Greg Prichard, more credible than the defense's expert, Dr. Hyman Eisenstein. *See Ponticelli v. State*, 941 So. 2d 1073, 1098 (Fla. 2006) ("[W]e defer to the trial court's finding of fact when faced with conflicting expert testimony.").

Dr. Eisenstein, a clinical psychologist and neuropsychologist, testified that Bargo was a highly complex individual who had received multiple diagnoses over the years, including ADD/ADHD, oppositional defiant disorder (ODD), bipolar disorder, schizoaffective disorder, anxiety, and depression. Dr. Eisenstein opined that Bargo was currently suffering from depression and anxiety, that his ODD had been remedied over time, and that his other diagnoses were all "inactive." Dr. Eisenstein also opined that the murder was complex

- 14 -

but not well planned. At the *Spencer* hearing, Dr. Eisenstein testified about "emotional intelligence" or "emotional quotient" (EQ), concluding that Bargo's EQ at the time of the murder was "somewhere between 14, 15 years old . . . in terms of his thought processes, in terms of his behavior." While acknowledging there was "no test, per se" for EQ, Dr. Eisenstein explained that he reached his conclusion based on all factors and circumstances, including Bargo's parents' acrimonious divorce.

On the other hand, Dr. Prichard, a forensic psychologist, testified that "the most appropriate diagnosis for Mr. Bargo" was ODD, which, according to Dr. Prichard, is a behavioral disorder rather than a neurochemical disorder. Noting that Bargo's records contained an earlier diagnosis of ODD, Dr. Prichard opined that Bargo met "at least six" of the eight criteria for ODD. And Dr. Prichard offered explanations for why the events surrounding the murder were consistent with that diagnosis rather than being driven by psychosis or bipolar disorder, including that Bargo's behavior was "far too organized." As to Bargo's other past diagnoses, Dr. Prichard opined that Bargo had likely been misdiagnosed, reasoning that two of those diagnoses were

"mutually exclusive," and noting "the failure of the various psychotropic medications prescribed for [Bargo] over the course of his life." Such medications, according to Dr. Prichard, cannot treat a behavioral disorder. Dr. Prichard summed up:

> [T]he data is not there to say that [Bargo] was under the influence of extreme mental or emotional disturbance. I don't think he was symptomatic of anything at the time. I think oppositional defiant is kind of his personality, so he had the same personality, but not symptomatic in terms of bipolar or anything he couldn't control.
> The planning tells me that, you know, it wasn't some kind of acute thing where he just lost it for a second. This thing went on for a long time from beginning to end.

The circuit court found Dr. Eisenstein's testimony less credible, reasoning in part that Dr. Eisenstein, who indicated he was aware of the facts of the case, "stated several times that, 'I don't know what happened,'" when pressed about evidence and other witness testimony. The court viewed those statements as an admission of Dr. Eisenstein's "lack of knowledge as to the details of the crime and the exact nature of the Defendant's role in the offense." Elsewhere in the Sentencing Order, the court explained that "Dr. Eisenstein failed to identify any aspect of [Bargo's] 'thought processes' or 'behavior' . . . that suggested that [Bargo] was

functioning with the maturity level of a 14 or 15-year old." And the court noted that Dr. Prichard's opinion testimony, on the other hand, "rationally explained" what the records showed to be "a consistent pattern of behavior on the part of [Bargo]."

In assigning this mitigator slight weight, the circuit court concluded that it was established that Bargo "suffers from a mental disorder which may in some way *explain* [his] behavior at the time of the offense," but that there was no evidence the disorder "caused or contributed to the crime or impacted him such that he was incapable of regulating his conduct or making the choice not to plan and carry out the murder."

Given this record, we cannot say that the circuit court's decision was unreasonable. Indeed, we have upheld the outright rejection of this mitigating circumstance where the facts of the crime "show[ed] an element of planning" and the defendant was not shown to be under the influence of a disturbance "at the time of the murder." *Hoskins v. State*, 965 So. 2d 1, 17 (Fla. 2007). We have also upheld the rejection of this mitigating circumstance when there was a "conflict in [expert] testimony" and the sentencing order revealed "thorough consideration of th[e] issue" by the trial court.

*Philmore v. State*, 820 So. 2d 919, 937 (Fla. 2002). Here, there was evidence presented regarding Bargo's planning of what Dr. Prichard described as a "very well thought out" crime. Dr. Prichard also offered reasoned analysis for his conclusion that "the data [was] not there to say that [Bargo] was under the influence of . . . anything he couldn't control." And a review of the Sentencing Order reveals that the circuit court carefully considered this issue.

We note that the circuit court employed somewhat similar reasoning with respect to related proposed mitigating circumstance "j.," that Bargo had been "diagnosed with an abnormal brain scan, bipolar disorder, schizoaffective disorder and a complex partial seizure disorder." The court found that, yes, it was established that Bargo had been "*diagnosed*" with those conditions over the years, but that the circumstance did "not tend to mitigate against a sentence of death." Noting the conflicting expert testimony, the court concluded that "it was not established by the greater weight of the evidence that the Defendant actually suffers from the listed medical or mental health conditions." This, too, was a reasonable conclusion with record support.

For example, the circuit court addressed the testimony of defense expert Dr. Joseph Wu, a psychiatrist, who opined that a PET scan of Bargo's brain "was abnormal" and that it "revealed that [he] suffered from a 'partial complex seizure spectrum disorder.' " In doing so, the court noted that two of the State's experts, Dr. Steven Nelson and Dr. Geoffrey Negin, both medical doctors, contradicted Dr. Wu's testimony. As the court noted, "Dr. Nelson testified that a person experiencing a complex partial seizure would be disoriented, confused and unable to communicate for a period of time after suffering the seizure." Indeed, Dr. Nelson listed reasons why the murder was not the product of a seizure, including that Bargo was able to "carry out an organized plan." Dr. Nelson also explained why Bargo's PET scan was "incompatible with epilepsy." Dr. Negin similarly testified that Bargo's PET scan was "not consistent with" a seizure disorder. Dr. Negin explained "that the PET scan reviewed by Dr. Wu . . . revealed hyperactivity in an area of [Bargo's] brain rather than showing the hypoactivity that would be expected if the patient was suffering from a seizure disorder." Dr. Negin further testified that in any event "an MRI scan was the normal tool used to verify the existence of seizure-related issues in

the human brain," and he offered potential explanations for "the hyperactivity apparent in [Bargo's] PET scan." We decline "to reweigh the evidence and to ourselves resolve [the] conflicting expert testimony," as it "is not our role" to do so. *Kocaker v. State*, 311 So. 3d 814, 821 (Fla. 2020).

B. The capacity of Bargo to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was impaired.

The circuit court concluded that Bargo failed to prove the existence of this mitigating circumstance. Bargo again argues that the circuit court abused its discretion in purportedly failing to provide " 'exact' details" of its decision. We conclude that the circuit court's rejection of this proposed mitigator is supported by "competent, substantial evidence." *Lebron*, 982 So. 2d at 660.

The circuit court began by reiterating why it found "the credibility of Dr. Eisenstein's opinions [and] explanations of [Bargo's] mental status" to be "diminished." The court further noted that Dr. Eisenstein nevertheless "did *not* testify that he believed [Bargo's] capacity to appreciate the criminality of his conduct, or to conform his conduct to the requirements of the law, was impaired." On the other hand, the court concluded that Dr.

- 20 -

Prichard had "rationally explained" Bargo's "consistent pattern of behavior" and had testified that Bargo's behavioral disorder "did not affect [his] ability to choose to act in conformity with rules."  Indeed, Dr. Prichard gave an example of how Bargo had demonstrated that ability, namely when Bargo "chose to stop using drugs while he was in prison in order to regain his visitation privileges."  Again, these conclusions all have record support.

Bargo also asserts that the trial court "failed to include the important findings of Doctor Joseph Wu and Doctor Robert Berland" when addressing Bargo's mental mitigation.  But the testimony of those two experts was contradicted by the State's experts and, in the case of Dr. Berland, was additionally questionable.

As noted above, the circuit court, when separately addressing proposed mitigating circumstance "j.," explained how Dr. Wu's opinion that Bargo suffered from a "partial complex seizure spectrum disorder" was contradicted by Dr. Nelson and Dr. Negin. That was a conflict for the circuit court to resolve.

Dr. Berland, whose prior testimony was read to the jury, he had conducted a mental health evaluation of Bargo, reviewed

records, and administered the MMPI-II, a psychological test, by reading it to Bargo. Dr. Berland had also administered the test to Bargo's father. Dr. Berland testified that Bargo "had a lot of delusional paranoid thinking" and "had symptoms of psychosis." In the end, Dr. Berland concluded that Bargo "suffers from a biological, mental illness . . . and brain injury has probably enhanced the symptoms." But Dr. Berland also testified that "there's a group of people that say you shouldn't read [the MMPI-II test], that you should use the recorded version [of the test]." And Dr. Berland conceded on cross-examination that Bargo's "extremely high" score on one of the validity scales for the test would lead "most professionals" to conclude that the test was invalid. It is difficult to fault the circuit court for not discussing Dr. Berland's testimony at length. And in any event, as the circuit court noted, Dr. Prichard testified as to why he "did not believe that [Bargo] suffered from bipolar disorder or a schizoaffective disorder."

We have upheld a trial court's rejection of this mitigator "when a defendant's actions during and after the crime has indicated that he was aware of the criminality of his conduct." *Bright v. State*, 299 So. 3d 985, 1006 (Fla. 2020) (quoting *Ault v. State*, 53 So. 3d 175,

188 (Fla. 2010)), *cert. denied*, 141 S. Ct. 1697 (2021).  Here, the evidence supports the conclusion that Bargo's actions "indicated that he was aware of the criminality of his conduct."  *Id.*  Indeed, Dr. Prichard testified that "the coverup tells you [Bargo] recognized how criminal it was," including "burning the body," "removing teeth," disposing of "[t]he ashes and the body parts," and "leav[ing] town."

### IV. Bargo's Age and Other Mitigators

Bargo next argues that the circuit court failed to adequately consider and assigned too little weight to his age and certain other mitigating circumstances.  "[T]he weight assigned to a mitigating factor is reviewed under an abuse of discretion standard."  *Lebron*, 982 So. 2d at 660.  Bargo's claim lacks merit.

A. <u>Bargo's age—given "slight weight"</u>

"In Florida, numerical age alone may not be mitigating if not linked to some other material characteristic (e.g., immaturity)."  *Id.* This Court has "long held that the fact that a defendant is youthful, 'without more, is not significant.' "  *Mahn v. State*, 714 So. 2d 391, 400 (Fla. 1998) (quoting *Garcia v. State*, 492 So. 2d 360, 367 (Fla. 1986)).  In order "to be accorded any significant weight as a

- 23 -

mitigating factor, '[a defendant's age] must be linked with some other characteristic of the defendant or the crime such as immaturity.' " *Id.* (quoting *Echols v. State*, 484 So. 2d 568, 575 (Fla. 1985)).

Bargo relies on Dr. Eisenstein's testimony that Bargo had an EQ of a fourteen- or fifteen-year-old "in terms of his thought processes, in terms of his behavior." Bargo argues that, among other things, the circuit court "did not take the time or the resources to actually understand the body of research behind EQ." We conclude that the circuit court did not abuse its discretion.

As an initial matter, the circuit court noted that Dr. Eisenstein conceded there was "no test, per se" for measuring EQ. The court thus considered his opinions to be "subjective and closer to a 'guess.' " Moreover, as the court alluded to, Dr. Eisenstein repeatedly stated something to the effect of "I don't know what happened" when pressed about evidence and other testimony. But more importantly, the court explained that "Dr. Eisenstein failed to identify any aspect of [Bargo's] 'thought processes' or 'behavior' before, during or after the instant offense that suggested that [Bargo] was functioning with the maturity level of a 14 or 15-year

old."  Indeed, the court concluded that "[n]o part of the evidence . . . suggest[ed] that any lack of maturity contributed to [the] murder."  Rather, according to the court, the evidence established that the murder was "conceived, explained and orchestrated" by Bargo, who "encouraged, directed and corrected the activities of others."  The court, which was unable to reconcile Dr. Eisenstein's testimony with Bargo's "behavior at the time of the offense," was under no obligation to attribute much weight to that testimony.  *See Coday v. State*, 946 So. 2d 988, 1002 (Fla. 2006) ("[E]ven uncontroverted expert opinion testimony may be rejected if that testimony cannot be squared with the other evidence in the case.").

Lastly, Bargo asserts that this Court in *Bargo I* "recognized the age of Mr. Bargo as a mitigating circumstance."  But *Bargo I* did no such thing.  Indeed, *Bargo I* addressed the *Hurst* issue and no "other penalty phase claims."  *Bargo I*, 221 So. 3d at 570.

B. Weight assigned to certain nonstatutory mitigation

Bargo argues that "[t]he trial court abused its discretion when it assigned 'little weight' or 'slight weight' to [ten] mitigating circumstances without giving a factual or legal analysis."  Relying principally on *Hudson v. State*, 708 So. 2d 256 (Fla. 1998), and

*Campbell v. State*, 571 So. 2d 415 (Fla. 1990), *receded from on other grounds by Trease v. State*, 768 So. 2d 1050 (Fla. 2000), Bargo's argument is that the circuit court did "not explain the reasons for the weight assigned to" the mitigating circumstances. But we have made clear that our caselaw does not impose such a requirement on the sentencing court. *See Rogers*, 285 So. 3d at 890 (receding from *Oyola* "to the extent that it employed a requirement that a trial court expressly articulate why the evidence presented warranted the allocation of a certain weight to a mitigating circumstance"). We thus reject Bargo's argument.

## V. Proportionality – Relative Culpability

Lastly, Bargo argues that his death sentence is disproportionate. He recognizes that this Court in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), "eliminate[d] comparative proportionality review from the scope of our appellate review." *Id.* at 552. But he asserts that "relative culpability review" survived *Lawrence* and that, under a relative culpability review, his death sentence is disproportionate "in light of the other sentences of the codefendants," none of whom has been given a death sentence.

- 26 -

We need not decide whether "relative culpability review" survived *Lawrence*. Indeed, Bargo's claim fails under this Court's pre-*Lawrence* caselaw, which generally rejected claims of relative culpability raised by "triggerman" defendants. *See, e.g., Blake v. State*, 972 So. 2d 839, 849 (Fla. 2007) ("We have rejected relative culpability arguments where the defendant sentenced to death was the 'triggerman.' "). And although "the triggerman has not been found to be the more culpable where the non-triggerman codefendant is 'the dominating force' behind the murder," *Stein v. State*, 995 So. 2d 329, 341 (Fla. 2008), here the sentencing order makes clear that the evidence established that Bargo not only fired the gun but planned all aspects of the murder. We reject Bargo's claim of relative culpability.[6]

## CONCLUSION

For the reasons stated above, we affirm Bargo's death sentence.

---

6. Two of Bargo's four codefendants (Wright and Hooper) were juveniles at the time of the murder. Any relative culpability review would thus be "inapplicable" with respect to them, given their "ineligib[ility] for the death penalty." *Sanchez-Torres v. State*, 130 So. 3d 661, 675 n.5 (Fla. 2013).

It is so ordered.

CANADY, C.J., and POLSTON, LAWSON, MUÑIZ, COURIEL, and GROSSHANS, JJ., concur.
LABARGA, J., dissents with an opinion.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

LABARGA, J., dissenting.

In my dissent in *Lawrence v. State*, 308 So. 3d 544 (Fla. 2020), I raised my concerns about this Court's elimination of comparative proportionality review in cases where a death sentence has been imposed. Because Bargo's case is a prime example of the need for comparative proportionality review, I respectfully dissent.

Comparative proportionality review previously required this Court to complete a comprehensive analysis in every death penalty case to determine whether the crime at issue falls within the category of both the most aggravated and the least mitigated of murders, thereby assuring uniformity in the application of the death sentence. While Bargo's case involves significant aggravation, it also involves significant mitigation. As the majority notes, during the initial penalty phase, the trial court found two statutory mitigators and fifty nonstatutory mitigators. Majority op. at 3. The

- 28 -

record revealed evidence of significant mental health mitigation dating back to Bargo's childhood.

In Bargo's initial direct appeal, Justice Pariente explained in a concurring opinion her "serious concerns in this case about whether the death sentence is proportionate for this eighteen-year-old with significant mental health mitigation." *Bargo v. State*, 221 So. 3d 562, 570 (Fla. 2017) (Pariente, J., concurring). Justice Pariente described the following:

> The defendant was eighteen years old at the time of the crime, and the trial court found two statutory mitigators (age and under the influence of extreme emotional distress) and numerous nonstatutory mitigators—including that defendant suffers from frontal lobe brain damage, bipolar disorder, schizoaffective disorder, complex partial seizure disorder, hallucinations, and diminished control over inhibitions, was abandoned by his father, grew up in a disadvantaged and abusive home, has a severe substance abuse problem which aggravated a neurological disorder, along with the possibility that the defendant was misdiagnosed and treated for ADHD. The trial court did not ascribe great weight to any of this mitigation. However, a review of the record indicates that Bargo's mental health mitigation reaches far back into his childhood, rather than emanating from evaluations occurring after the murder occurred.

*Id.* at 570-71.

Prior to this Court's abandonment of comparative proportionality review, our case law determined that reliable, uncontroverted evidence of mental health mitigation coupled with age indicates that a sentence of death may be disproportionate, even in light of substantial aggravation. *See, e.g., Crook v. State*, 908 So. 2d 350, 352, 358 (Fla. 2005); *see also Morgan v. State*, 639 So. 2d 6, 14 (Fla.1994); *Livingston v. State*, 565 So. 2d 1288, 1292 (Fla.1988).

As this Court aptly observed in *Tillman v. State*, 591 So. 2d 167, 169 (Fla. 1991), "proportionality review in death cases rests at least in part on the recognition that death is a uniquely irrevocable penalty, requiring a more intensive level of judicial scrutiny or process than would lesser penalties." Given Bargo's extensive mental health mitigation dating far back into his childhood, coupled with the fact that he was only eighteen years old at the time of the crime, a comparative proportionality review would have benefitted this Court's analysis. "Failing to consider a death sentence in the context of other death penalty cases impairs the reliability of this Court's decision affirming that sentence." *Lawrence*, 308 So. 3d at 558 (Labarga, J., dissenting).

Accordingly, because I believe comparative proportionality review would have provided this Court with a significant and useful lens through which to analyze Bargo's case, I respectfully dissent.

An Appeal from the Circuit Court in and for Marion County,
    Anthony Michael Tatti, Judge – 422011CF001491CFAXXX

Philip J. Massa of Philip J. Massa, P.A, West Palm Beach, Florida,

    for Appellant

Ashley Moody, Attorney General, Tallahassee, Florida, and Doris Meacham, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee